Good morning, Your Honors, and may it please the Court, my name is Justin DeLon, and I have the pleasure today of representing Mr. Terrance Lavigne, plaintiff appellant in this case. This case presents several issues for appeal, however today I'd like to focus for oral argument purposes on three main points. First, in keeping with the mandated liberal interpretation of EEOC charges, the plaintiff's race retaliation claim which was contained in his amended charge of discrimination relates back and is timely because of that and cannot be attacked as untimely because of that to his original charge of discrimination because it is both factually related to the facts of his original charge and, in this case, actually grew out of the EEOC's investigation into his original charge. Second, in granting the defendant's motion for reconsideration, the district court utilized an improper legal standard, reversing its prior finding of race discrimination in favor of the plaintiff and in doing so erroneously focused its comparator analysis on irrelevant factors such as job titles and labels and categories used by the defendant to categorize the plaintiff whenever the focus of a comparator analysis for a disparate compensation case should focus primarily on the job duties and responsibilities at issue in the case. Alternatively, on that point, if it is determined that the legal analysis that the district court used is correct, nevertheless, the plaintiff submits that the district court clearly erred in finding in favor of the defendant. The overwhelming evidence in this case supports the plaintiff's position that he was repeatedly paid less than white superintendents for performance of the same job duties. The summary of this evidence can be found at the last section of the plaintiff's opening brief, which outlines it pretty thoroughly. Third, the district court committed legal error in denying the plaintiff's request for damages for mental anguish and emotional distress on the grounds that he had failed to plead them. However, that is completely incorrect in this case as the plaintiff, representing himself pro se in his complaint, made a demand for all damages allowable under state and federal law. I believe that it is a reasonable interpretation of this to make a demand, to say that that asserts a demand for those types of damages, mental anguish and emotional distress. But that's not all. Later, once the plaintiff had obtained counsel, clarified this statement in a subsequent pleading in the joint pretrial order. In this pretrial order, signed by both parties and signed by the court, the plaintiff specifically demanded all damages . . . I guess the specific damages under Title VII, including a specific enumeration for mental anguish and emotional distress, approximately caused by the actions of the defendant. In keeping with that, at the district court, on the trial in this matter, presented evidence from testimony and documentary evidence supporting his claim for mental anguish and emotional distress. And therefore, the district court erred in denying this claim. To my first point regarding the plaintiff's retaliation case, the district court dismissed the retaliation claim on the grounds that he had failed to exhaust his administrative prerequisites prior to filing the suit. But as I alluded to earlier, this holding was legal error. As this court is aware, allegations and claims in an amended charge relate back to and cannot be attacked as untimely if they are related to or grow out of the operative facts contained in the original charge. And that's exactly what we have in this case. Isn't this a little bit different because isn't it adding a new claim of retaliation? It is a race retaliation. It is adding the race retaliation claim. However, the facts of the race retaliation claim are very much connected to the original charge of discrimination, which claims race discrimination. And specifically, the complaints in the original charge form the basis of the protected activity that we have for the retaliation claim. Specifically, prior to his termination, he was at his supervisor's door complaining about the very acts that he alleged in his original charge. It is our position, the plaintiff's position in this case, that a race discrimination claim arising out of a nucleus of operative facts is related to a race retaliation claim that arises out of those same facts. Do you think that the defendants were put on proper notice back then that there was a retaliation claim involved in the case? Well, I believe that, yes, Your Honor. I believe that they were, and I believe that requires a little bit more explanation. In their response to the original charge of discrimination, the defendant raised a potential defense to a race retaliation claim. In fact, they stated in there that they had no knowledge of any protected activity of him ever reporting any discrimination or anything like that. Subsequently, whenever he amended this charge, the defendant had an opportunity to respond at the EEOC level prior to suit ever being filed. They were given notice and a chance to respond prior to suit being filed. I believe that their interests were fully protected in this case, especially considering the fact that I don't believe that the retaliation case, while it was added to the claim more than 300 days outside of the . . . How did they respond to a retaliation claim before one was made? In this particular case, putting myself in the defendant's position, prior to his termination, they had just heard from him complaining about these very things. Next thing you know, they receive an EEOC charge where he's complaining about these very things. Then, whenever you get to their opposition, they're saying that, well, he never complained about these things. I believe that that certainly alludes to a notice of a potential race retaliation claim. Keeping in mind that the plaintiff's timely claims that we also hear about, the disparate compensation claims, actually occurred prior to his . . . chronologically prior to his race retaliation. They weren't put in any danger of defending against a claim that has been long since passed. They had proper notice prior to suit being filed, an opportunity to respond to a claim that had just happened within the last year. I believe, Your Honor, it's our position that the retaliation claim should relate back. In his charge of discrimination, I thought he said that he indicated that the earliest date of discrimination was February 7th, and the latest instance was February 17th, so that the discrimination happened between February 7th and February 17th, yet he wasn't terminated until March. So how can he say that he was fired in retaliation when he's saying that the acts of discrimination happened at a period prior to when he was actually terminated? Well, Your Honor, I think in this case, we have to look beyond just the boxes that are checked and beyond the dates that are put in there, and try to look at the substance of the EEOC charge as opposed to the form itself. The substance of the charge alleged facts that occurred prior to that date and outside of that date, and I believe that it is imperative that we not allow the form to override the substance in this case, especially considering the remedial nature of Title VII. These procedural prerequisites should not become, I guess, a minefield for hapless charging parties. They are not educated in this area of the law, and in fact, this form was created by the EEOC, sent to him for his approval. They in their, I guess, wisdom marked those dates, and the plaintiff signed it, unfortunately to his detriment if we're relying strictly on the dates that he set forth in there, but I believe that the facts of the original charge speak to dates outside of that. He went into the EEOC on March 28th, is that right? Yes, Your Honor. On March 28th, 2011. That was six days after he got fired. Correct, Your Honor. And he filled out the form that the EEOC told him he needed to fill out? Yes, Your Honor. He filled out an intake questionnaire and itemized his claims in there, and at the very end indicated a call to action for the EEOC to take remedial action against the defendant in that case. And that, of course, brings in another issue that the plaintiff has presented for review in this case is regarding the district court's determination that the operative date for the limitations period was August 22nd, 2011, the date that the EEOC finalized and had signatures and everything on the form of discrimination, as opposed to the date that he actually went to the EEOC, which was March 28th, 2011. But moving to my second point regarding the disparate compensation claims, as I alluded to earlier, the district court applied an incorrect standard of law in granting the defendant appellees . . . So you said that brings up a second point. We don't need to address that point? So they agree with you that the date of the charge is March 28th, 2011? No, Your Honor. They do not. They do not agree that the date is August 22nd. The defendant's position is that August 22nd, 2011 was the correct date, but it's the plaintiff's position in this case that the Supreme Court decision in Hallowecki is controlling, and as a result, March 28th, 2011 should have been the date utilized by the district court as far as setting the statutory time period, the 300-day time period is what I'm alluding to in that case. The . . . Hallowecki discusses basically when other papers, not the formal charge of discrimination, can constitute a charge of discrimination, and in that decision, it was . . . the ultimate question is whether or not these other papers requested the agency to take remedial action. In this case, the intake questionnaire did request that they take remedial action, as can be noted in the record whenever the EEOC sent out on March 28th notices to the parties, including the Louisiana Commission on Human Rights, notifying them that a charge had been filed by Terrence Levine alleging race discrimination. And the EEOC did a transmittal form, did they not, wherein they indicated that the date of the charge was March 28th? Correct, Your Honor. All right. Part of the problem in this case with regards to that issue, and actually with regards to retaliation, is the fact that after the plaintiff went to the EEOC, nothing happened in this case for a very long time. It was approximately five months before they got him a formal charge of discrimination for him to sign, and even after that was filed, it was several months, almost . . . it was actually the next year before an investigation was begun into his claims, and that's whenever they immediately said, you need to amend to add a retaliation claim. And he went in the next day and did that, didn't he? It was very . . . well, they were in Houston at this point, and it had been transferred out of New Orleans to Houston, but he did very quickly amend his claim, and it was sent to the defendant for their opportunity to respond. All right. Regarding the disparate compensation claim, the district court applied an incorrect standard of law in that case. I believe that, as announced by this court in Goring, the question is, for a disparate compensation claim, is the plaintiff must show that he was a member of a protected class and was paid less than a nonmember for substantially the same job responsibilities. It's a very simple and objective test. Under this test, as the district court correctly found in its February 4th decision before the motion for reconsideration was filed, found correctly in favor of the plaintiff. However, on the motion for reconsideration, it is our position that their comparator inquiry, which is utilized in all disparate treatment type claims, changed its focus and utilized irrelevant factors that then became controlling in the case. They focused on the plaintiff's job title as compared to other job titles. In the reply brief, the plaintiff analogized to the court's interpretation and the statutory interpretation of the Equal Pay Act. In the Equal Pay Act, it's very clear that it's about the duties, not the job titles, because in the Equal Pay Act, as is our position in this case, shuffling job titles and . . . As I understand, you're playing his argument, and I guess I'm trying to . . . You only got a minute left. I understand, sir. His argument has to do with what he was required to do. Correct. Is that right? Not what they called it. Correct. It's about what he did objectively compared to what the others did. Your contention is that the facts indicated that the responsibilities that he carried out would have, if he had been in his claim appropriately . . . He would have been called a superintendent. Oh, yes, Your Honor, without a doubt. Because he was performing those job duties. Yes, Your Honor, without a doubt. And that's essentially the alternative portion of that is factually, if you look at the facts of this case, it's still in favor of the plaintiff. The district court clearly erred on that issue in finding in favor of the defendant, because the facts overwhelmingly support the plaintiff's position in that matter. And with ten seconds remaining, Your Honor, I will bow out at this particular time. Thank you, Mr. DeLonge. Is that your notebook, Mr. Lowell? Good morning, Your Honors. David Lowell on behalf of Cage's Deep Foundations. I think a good place to start is with the original charge that the plaintiff filed in this matter. He went to the EEOC days after being terminated. At that time, he could have filed the charge of discrimination. He elected not to. He chose instead to file a questionnaire, or to fill out a questionnaire. In the questionnaire, he could have described every act of discrimination that he was allegedly subjected to by Deep Foundations. He did not. Instead, he clearly only discussed two events occurring in February of that year. And that is what the EEOC . . . You're saying that when he went into the EEOC, they gave him two options? You can file a charge, or you can fill out a questionnaire? Well, I don't know what options they gave him, but an individual can go in pro se and file a charge of discrimination. They don't have to initially file the intake question or fill out an intake question. Your evidence is he elected with an option in front of him. You can file a charge, or you can fill out a questionnaire? And he made an election to fill out a questionnaire and forego the opportunity to file a charge. That's what the evidence shows. We don't know what the evidence is, Your Honor. Well, you had a trial, right? He did have a trial, correct. And you're standing here now telling me that that's what he did, and that's not in evidence? Isn't it important what he did and when he did it, or at least you contend it is? Absolutely it is. And you had a trial, and we don't know whether the evidence is that he went into that office and elected not to file a charge. Plaintiff also contends that it is important what he did and when he did it. However, they never introduced, either at the summary judgment standard or at trial, the intake questionnaire. But what's the purpose of the intake questionnaire? I think more than anything else, it's to provide some background information, presumably, on which to base a charge, or actually to determine if you have a claim. But counsel, if we're standing here now trying to decide whether or not his claims are appropriately time barred because he didn't file a charge, it seems to me that the facts in connection with that first visit to the EEOC are important, and you're not telling me he made some election not to file a charge. You're just saying, post-trial, we just don't know. But you're asking us to affirm a determination that the claim is time barred. Isn't that right? Well, in part, Your Honor, correct. The plaintiff is asking this court to reverse the district court's decision based upon documents not in evidence. They've never presented what was in the intake questionnaire. That would have been one way to easily address the issue of whether or not his charge and his amended charge were time barred. Well, he doesn't need the questionnaire necessarily because he contends that he filed a charge. Correct. And there's no argument that the EEOC investigated the charge, right? No, Your Honor, there's no dispute about that. However, what they're now arguing for the first time on appeal is that the date of the charge is March 28th. Instead, it's the date on which the plaintiff went in and filed his intake questionnaire. So they're the ones who went in. And the EEOC apparently agrees with him that the date of the charge is March 28th. Isn't that right? Isn't that what they put on their transmittal form? Yes. Well, the EEOC agrees with us, and Judge Jackson agreed with us that the date of the charge is the date that's controlling, not the intake questionnaire. The intake questionnaire was filled out in March of 2011. I'll let you go ahead. There's a separate form where the EEOC indicated on that form that the date of the charge was March 28th. Okay. But that really does not matter in the grand scheme of things because the only claims that were dismissed as untimely based upon the August 2011 date were disparate compensation claims, which the court ended up finding he failed to carry his burden on. So even if we go back to the March date, which we're not willing to concede that's the correct date, but assuming for the sake of argument that that is the correct date, it's irrelevant because the claims that were dismissed that are now on appeal based upon the dismissal are disparate pay claims, which after trial, after all the discovery, after a day and a half, he was treated differently based upon his rights. The other claim that they're alleging should not have been dismissed on summary judgment as a retaliation claim, and that gets into a different issue because even if we go back to the March 2011 date as the date that his charge was filed, he still amended a year later, which is more than the 300-day limit, which would then . . . Well, he did find disparate pay initially, then change his mind, is that what happened? Well, actually his initial claims were that . . . sorry, I'm getting used to the reading glasses. His initial claims in the charge were that he was not being paid for a supervisory job even though he had supervisory duties, and also that he was wrongfully terminated . . . well, that's in the complaint. I'm sorry. That . . . But it wasn't actually being paid for the higher supervisory position. I thought your defense was that he only occupied that position from time to time on a temporary basis. Is that correct? Correct, Your Honor. The plaintiff had a supervisory position. He was a drill shaft foreman. There's no disputing that. He claims that he was occupying a different supervisory position, that of superintendent, and that's in part where . . . But he was from time to time. From time to time. Yes, correct, Your Honor. But you didn't pay him for that. But as were other employees, multiple white male employees also did the same duties that the plaintiff performed. Right or wrong, whether they should have gotten it or not, that we treated them all the same, everybody the same. Exactly, Your Honor. We didn't pay any of them for doing that. Exactly, and that's why the job title actually comes into play because they based their pay on the job title as opposed to the duties that were performed. It's a big construction company. But in an equal pay case, you agree with me that you would be looking at what the duties were versus just focusing on what you call somebody. What's important is . . . I guess if I'm at work every day, it's nice to have a title, but actually what's important to me is what I'm doing. And if he's doing the job, isn't it appropriate to focus on what the work is rather than what you're calling? Absolutely, Your Honor. The only reason why we get into the job title is because it did create a distinction that is important. But throwing out the job titles, the duties that the plaintiff performed were the same as other white male employees performed and did not receive the superintendent's pay that he's seeking. And that's exactly what the district court found in its motion for reconsideration. If you look through the February 2015 ruling by the district court, nowhere in there does it state that the plaintiff was treated differently because of his rights, which is required in order to prove a disparate compensation claim. Instead, they just found that he was paid differently. But then, on reconsideration, after looking at the facts again, the court realized that there were multiple white male employees who performed the same duties as the plaintiff and were paid the same as the plaintiff or on the same scale as the plaintiff. None of them received the superintendent's pay. Is that in the order? I'm sorry, Your Honor? Is that in the court's order? Yes. Is that where they made this finding about the multiple white males who were? That's in the motion, the hearing on the reconsideration, the July 2015 ruling. I can get you this. You don't have to now. You can go ahead with your argument. But yes, Your Honor, that's what the court found. And it listed two white males to whom the plaintiff could be compared. One was Jonathan Sharp and the other was Horace Legros. Jonathan Sharp was a drill shaft foreman, just as the plaintiff was, who was then promoted to superintendent later. And he testified that while he was working as . . . Had you ever promoted a man of color to superintendent? I'm sorry, Your Honor? Had you ever made a man of color superintendent except on a temporary basis for which you didn't pay him? For which we didn't pay him? Well, you didn't pay anybody for doing that. Correct. But you also never had a black superintendent. Is that true? Not with that actual job title. That is correct, Your Honor. I don't . . . The hope was that . . . I'm sorry? I don't . . . You're qualifying it. I don't know what you mean by that. You did or you did not. You did or you did not have a black person as a superintendent. I'm putting aside the line foreman or whatever they're called that on some job temporarily would act because they're the only person there in that position. But did you ever have a black person appointed to superintendent? There was no black employee who was promoted to superintendent with that title. There were many who performed the duties, just as there were many white employees who were not paid as a superintendent. The reason why that's important is because the plaintiff did not bring, or what was not before the court was a denial of promotion claim. Instead, he claimed that he performed the duties and should have been paid.  Well, I understand that, but it happens that you're going to be able to . . . How often did he act as superintendent? How often did that happen? There were two instances at issue at trial. He had been working for Deep Foundation since approximately 2007. How long of periods of time did he actually act as superintendent? It was essentially after his promotion to drill chef foreman. How long of a period of time? I believe it was a little over a year to a year and a half between that point and when he was terminated. I'm not sure I understand what you said. My question is, what's the total amount of time that he acted as the superintendent? And went out and ran the jobs as they described it at trial? Because those are the duties of a superintendent. That's how he acts as a superintendent. He actually goes out and leads the job. I believe that was approximately a year and a half. He did that for a year and a half? Yes, Your Honor. And that was a temporary situation? It was a temporary situation because, as you can imagine for a construction company, they perform many jobs. Some might be a day. Some might be two days. How many, what was it, did you have white guys acting as superintendent for as long as a year and a half and not getting that pay? Absolutely, Your Honor. There were drill chef foremen who were never promoted to superintendent, who were white, who performed the duties of a superintendent on the drill only jobs as the plaintiff did, never were promoted to superintendent, and were only paid as a drill chef foreman as opposed to as a superintendent. Now I'm not clear. Did you say he was in the role of a supervisor for a year and a half or off and on, he'd fill in off and on for a year and a half? That's where it gets a little complicated. He was promoted to drill chef foreman, I believe, for approximately a year and a half before his termination. And drill chef foreman is a supervisory position. It's the position just below superintendent. And at that point, he was also selected for the elite program at Deep Foundations, which is an important program that the company uses to groom employees to enable them to move up and to be promoted to positions such as superintendent. And the hope was that he would be promoted to superintendent. But unfortunately, he had these employment violations and violations of company policy that resulted in his termination. What were those again? The ones that were at issue were he was involved in an on-the-job accident where he was operating a boom. He was coming underneath an overpass, the 310 overpass, at night. And Cajun's rules require that if you are operating equipment, you have to have a spotter. He testified he did not have a spotter. He was still operating at night. He testified that there was a light and he was distracted by the glare and didn't see the boom was up and struck the 310 overpass. And that damage had to be repaired. That was the event in February of 2011 that was described or formed the basis for his original charge. That was the period of time, the February 7th to 17th, 2011, that was only included in the original charge. And then while he was on probation, they discovered that he also had moving violations tickets. And so the combination of those two... What were the moving violations? They were speeding and something else. They were not related to his job duties. It was not during the performance of his job duties. But Cajun has a requirement that they disclose any of those because as part of their job duties, they're operating equipment. They're driving vehicles. And so they want to know, make sure that they don't have anything to be concerned about whether or not someone has violations that could impact their ability to either operate equipment or to drive company vehicles. They're operating equipment out on the highway. In his regular job duties, he's going to be driving company vehicles or operating company equipment on the highways? He's going to operate a company vehicle on the highway. Most of these jobs are not in Baton Rouge. Cajun's located in Baton Rouge. Most of the jobs require that they drive out to the job. And a lot of times, they do that in a company vehicle. And then when they get to the job, they will actually operate equipment. And in some cases, they will operate on the right-of-way. The lanes will be closed, and so they're operating on the right-of-way. But in order to operate the equipment, they need to know what kind of driving history they have. And the combination of those two per company policy precluded the plaintiff from being able to perform his job duties. And so that's why he was terminated. Was it the actual violations or the fact that he did not report the violations? It was the fact that he did not disclose the violations combined with the fact that he was already suspended for the accident. It just happened that they both occurred, that they discovered the violations when they ran his... If you have that accident, then you start looking. But the wrongful termination claim is not before the court? It just seems unlikely that you'd suddenly discover he had moving violations after he had that accident. I'm not... Whatever the consequence, that's aside. I'm just trying to understand what happened. But it sounds as though I understand it, that they had this accident with a vehicle, and then somebody started checking to find out if he had any other violations and came up with some, and then that was the basis of your actions. Well, and it may have been that because of the accident, they felt compelled to look at his driving record and to see if he had disclosed it. They do this yearly for every employee. Every employee that operates a company vehicle once a year has their driving record pulled for the previous three years. And so there's no disputing that that was done uniformly. Were there drill chef foremen who were paid more than Mr. Levine? There were, Your Honor. And how was that determination made about what the pay would be for that job? The pay for all positions, including drill chef foremen, was based upon experience and performance. And if you look at the last pages of the appendix that . . . So there weren't any white drill chef foremen making more than what Mr. Levine was paid unless they had more experience? Correct, Your Honor. But there were also African-American drill chef foremen who were being paid more than the plaintiff. And there was an African-American slash Native American drill chef foreman who was being paid more than the plaintiff. So that's where the job titles come into play because the job titles determine the range within which typically someone will be paid. And so he was paid within the range of the other drill chef foremen. I mean, that makes perfect sense to me, except what's problematic in this case is the title didn't necessarily always . . . it wasn't always commensurate with what the responsibilities were. Which is to say, you could have one title, but you could be asked to do something else that would typically be done by someone who held a different title. That's what's problematic in this case. And I understand, Your Honor, and that's absolutely true. You know, I understand that somebody in personnel says, this is what your title is or this is what your pay range is. But apparently somebody who's making job assignments says, understand what your title is, but this is what I need you to do. And it happens to coincide with what someone else would be doing who gets paid more. Correct, Your Honor. But also, sometimes that temporary assignment required that they perform duties above their job title. Sometimes it required that they perform duties below the job title. And when they performed the job duties below their job title, they still received the pay within that job title. So for the plaintiff, I believe it was $19 or $20 an hour, it didn't matter if he was performing duties above his job title or if he was just operating equipment, he was paid that amount. And I guess for me, what the problem is, is that it sounds like I could deny somebody a pay increase by just ensuring that I keep their job title at this title, irrespective of what I'm asking them to do. I could ask you to do what is the work of a superintendent, but as long as I make sure your job title is drill shaft foreman, then I never have to pay you above that pay grade. And I understand that, Your Honor, and that's correct. But in this case, there were white individuals who were treated exactly the same, who were required to perform duties above their job title of drill shaft foreman, and they were not paid as superintendents. They were still paid as drill shaft foreman. So I guess it's a company-wide situation, and that's what the district court relied on to conclude that the plaintiff was not treated differently because of his race, because they did it to everybody. Thank you. Thank you, Mr. Lowe. Yes, Your Honor, if I may respond briefly to some of the statements made by the defendant. In answer, in response to your question, Judge Higginbotham, there were more than just two duties on jobs. Those were the two timely instances, but as you'll see in the transcript and also in the plaintiff's opening brief, there were several jobs from 2010 to 2011 where not only did he perform those duties, but he was identified on the defendant's records as being a superintendent where there was paperwork identifying him as performing superintendent duties. And all this paperwork was discovered from the defendant. However, at the trial in this case, they didn't submit. Where we are is they don't deny it. They just said we did it to everybody, not just the black guys. Correct, Your Honor. What do you say to that? I think that is wholly false. And I'd like to know where they're getting that information. If you look at the record and where they're discussing this point in page 40 to 42 of their brief, there's not a single citation to the record in that case where they're discussing, well, we had all these other foremen that did these jobs. The record citations that they do have in support of this issue are from the testimony of Jonathan Sharp, one of the white superintendents, where he said, well, you know, a decade ago whenever I was a foreman, I did some of these duties. However, it was clear from his testimony and cross-examination that he did not do them to the same extent or frequency that the plaintiff did. And he managed to get promoted to superintendent, I guess. And he managed to get promoted to superintendent. In addition to that, Your Honor, Horace Legros, which the district court decided to compare the plaintiff to, was not there to testify. They simply credited the testimony of Jonathan Sharp in saying that Horace Legros does some of these duties as well. But we have all this paperwork, document, testimony in support of the plaintiff's position, but whenever it came time to support the defendant's position that there are all these others that do this and aren't paid, they did not support that with documents. These are the defendant's own documents which the plaintiff used to support its case. The defendant did not come back with documents saying, well, look, here's Horace Legros doing superintendent duties, and this is us mentioning Horace Legros as a superintendent on this job. In addition to that point, the defendant argues that only superintendents do drill and pour jobs, that it's all these . . . the other foremen do just drill-only jobs, completely overlooking . . . and that's also the position of the district court, that that's what they credited on the motion for reconsideration, but it completely ignores the fact that one of the timely disparate compensation claims was for a drill and pour job, and the plaintiff was a superintendent on that job. That's 11-527. It was a drill and pour job where it required him to call concrete, work with contractors in that particular position. In addition, I wanted to discuss the fact that the termination and what we discussed, the termination claim is properly before this court. It was dismissed prior to trial and summary judgment, and it's one of the issues raised by the plaintiff. That termination was, just like the retaliation claim, was dismissed on the basis that he did meet his prima facie case, but as this court will see in the briefing on that issue, he did, in fact, present a genuine issue of material fact that precludes summary judgment on the issue, but also discussing the relationship between the retaliation and termination. The facts, the February incident, in addition to the MVR, the motor vehicle report that we were talking about, the multiple tickets and stuff like that, those are incidents that right after he went and reported this discrimination that he had been suffering to his superintendent. Now we're talking about the retaliation claim and temporal proximity to these events. That's how it's all intertwined and weaved in in support of that position. Also, we have a very important piece of information here and a very important piece of evidence in support of the plaintiff. Does the record show, if anything, about the moving violations of white employees? Your Honor, there is some discussion in the record on that issue. The plaintiff's testimony in his deposition, these were all determined in the summary judgment stage. In his deposition, you'll see in the plaintiff's opening brief and reply brief, a discussion of these apparently legitimate non-discriminatory reasons and how they're pretextual. There's a lengthy discussion in there, but yes, Your Honor, there is some discussion regarding how his MVR report and these alleged tickets are pretextual. Also, with the same regarding the incident . . . Is there evidence that white employees had moving traffic violations without consequence to their employment status? I believe there is some evidence to that in the plaintiff's deposition, which is in the plaintiff's position with regards to that was that the ticket, the MVR report was false. It was that it was pretextual and should not be credited. The three tickets, the three moving violations which were on his MVR report, the plaintiff's position was that they were reported. The defendant said that it was that he concealed them. That didn't happen. It was the plaintiff's position that he did report them. Also, the third violation wasn't actually a moving violation. If you'll look at the MVR report, it was some entry by the DMV, but they went ahead and said, three instances, termination, that's your last strike. Your Honors, I'm out of time, but I just want to thank you for the opportunity to argue before you today. This was my first opportunity to do so, and thank you for your challenging questions and thank you for your participation. Thank you.